UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――――――x

BEATRICE LORS-ROUSSEAU,

                  Plaintiff,                     **COMPLAINT**

     -against-                         *Jury Trial Demanded*

THE NEW YORK WOMEN'S FOUNDATION,
ANA OLIVEIRA, DEBRA MILLER, and
CAMILLE EMEAGWALI,

                  Defendants.
―――――――――――――――――――――――――x

PLAINTIFF BEATRICE LORS-ROUSSEAU, by her attorney Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, New York 10006, alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

## THE PARTIES

1.      Plaintiff Beatrice Lors-Rousseau ("Plaintiff") is a female citizen of the United States who currently resides in Brooklyn, New York and who was formerly employed by Defendants The New York Women's Foundation, Ana Oliveira, Debra Miller, and Camille Emeagwali. At all relevant times herein, Plaintiff was a Black woman, pregnant and/or a woman with family caregiving responsibilities, and a person with a disability (a rare blood disorder) as defined by Title VII, the Americans with Disabilities Act (ADA), the Pregnancy Discrimination Act, the New York State Human Rights Law, the New York City Human Rights Law, the Equal Pay Act, and the New York State Equal Pay Act.

2.      Upon information and belief, at all relevant times herein, The New York Women's Foundation ("Defendant NYWF") was and is a non-profit organization registered in New York. Upon

information and belief, Defendant NYWF's headquarters are located at 39 Broadway, Suite 2300, New York, New York, 10006.

3.     Defendant NYWF was, at all times relevant herein, Plaintiff's "employer" within the meaning of all relevant Federal, State and local laws including, but not limited to, Title VII, the ADA, the Pregnancy Discrimination Act, the New York State Human Rights Law, the New York City Human Rights Law, the Equal Pay Act and the New York State Equal Pay Act.

4.     Plaintiff was, at all times relevant herein, Defendant NYWF's "employee" within the meaning of all relevant Federal, State and local laws including, but not limited to, Title VII, the ADA, the Pregnancy Discrimination Act, the New York State Human Rights Law, the New York City Human Rights Law, the Equal Pay Act and the New York State Equal Pay Act.

5.     Defendant Ana Oliveira ("Defendant CEO Oliveira") is/was Defendant NYWF's Chief Executive Officer and President.

6.     At all times relevant Defendant CEO Oliveira was Plaintiff's employer and had the ability to affect the terms and conditions of Plaintiff's employment.

7.     Defendant Debra Miller ("Defendant HR Director Miller") is/was Defendant NYWF's Director of Human Resources and Administration.

8.     At all times relevant Defendant HR Director Miller was Plaintiff's employer and had the ability to affect the terms and conditions of Plaintiff's employment.

9.     Defendant Camille Emeagwali ("Defendant VP Emeagwali") is/was Defendant NYWF's Vice President of Programs.

10.    At all times relevant Defendant Defendant VP Emeagwali was Plaintiff's employer and had the ability to affect the terms and conditions of Plaintiff's employment.

## JURISDICTION, VENUE, AND PROCEDURAL REQUIREMENTS

11.     This is a civil action for monetary damages and such other relief as the Court deems just and proper based upon Defendants' discrimination against Plaintiff based on gender, race, pregnancy, child caretaking responsibilities, and disability, as well as Defendants' retaliation against Plaintiff.

12.     This Court has Jurisdiction over this action under 42 U.S.C.A. § 2000(e) *et seq.*, and under 28 U.S.C.A. §§ 1331 and 1343(4).

13.     This Complaint is also brought pursuant to the New York State Human Rights Law and the New York City Human Rights Law.

14.     This Court has supplemental jurisdiction for all State and City claims pursuant 28 U.S.C § 1367.

15.     Venue for this action properly lies in this district pursuant to 28 U.S.C § 1391.

16.     All conditions precedent to filing the instant action have been fulfilled. On or about July 3, 2020, Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). On or about August 11, 2021, issued Plaintiff a Notice of Right to Sue. Plaintiff now files this Complaint within 90 days of Plaintiff's receipt of her Notice of Right to Sue.

## STATEMENT OF THE CASE

17.     Defendant The New York Women's Foundation is a nationally-recognized foundation that purports to create an equitable and just future for all women and girls, and Plaintiff Beatrice Lors-Rousseau was proud of the work she did with the partner organizations who received foundation grants ("grantee-partners"). During her tenure, Plaintiff worked tirelessly and successfully to respond to the needs of Defendants' grantee-partners, so that they could provide

essential services to women, girls, and Transgender non-conforming individuals ("TGNC") people in New York City and New York State.

18.     Unfortunately, behind closed doors – and, ironically given its purported mission – Defendants engaged in a practice of abject race, pregnancy, disability, and caretaker discrimination against Plaintiff and other pregnant, disabled, and caretaking women, and Black women. Defendants repeatedly proved that it did not value Plaintiff as an employee because she was a Black woman, a mother, an individual with a disability, and then a pregnant woman as much as non-Black, non-caretaking, non-disabled, and non-pregnant employees, and believed falsely that she did not or would not "work as hard" simply because she was a Black woman, a mother, an individual with a disability, and then pregnant with a high risk pregnancy.

19.     Defendants' hostility towards pregnant and working mothers was laid bare in Plaintiff's job interview, when the President/CEO of Defendant NYWF, Defendant CEO Oliveira, asked Plaintiff, who was already a mother: "I hope you don't plan on getting pregnant again within the first two years of [working at Defendant?]" Plaintiff, who did not know how to answer, was ultimately offered the job because Defendants needed a position filled quickly, and Plaintiff decided to accept because she believed in Defendants' work on behalf of women and girls.

20.     Unfortunately, however, Defendants had no intention of treating Plaintiff, a working mother with child-care responsibilities, an individual with a disability, and later a pregnant woman equally to women (and men) who were not parents, not disabled, and not pregnant. When Defendants finally did hire Plaintiff as a Program Officer, they paid her $10,000 less than similarly situated Program Officers who were not Black. When she tried to negotiate for equal pay, Defendants denied her request, and told her she was not expected to "work as hard" as the other Program Officers because she was a Black woman.

21.    Shockingly, while working at Defendants, two different former employees confided in Plaintiff that they had been subject to pregnancy and caretaker discrimination while at Defendants. In addition, another former employee told Plaintiff that Plaintiff was not offered a prior position simply because she had asked about work-life balance because of child-care, and maternity leave during the interview process.

22.    When Plaintiff vocally advocated for better policies for caregivers, mothers and pregnant women at Defendants, the discrimination increased. Suddenly, despite a successful career at Defendants and her working long hours and weekends on her projects, Plaintiff's supervisor called her "lazy" and a "slacker," said she did not work as hard as the other Program Officers, none of whom were mothers or caretakers, and threatened to terminate her.

23.    The discrimination increased even further when Plaintiff announced that she was pregnant, had a rare blood disorder and a high-risk pregnancy, and suffered from *hyperemesis gravidarum*. Plaintiff and her doctor asked for the simple but absolutely necessary reasonable accommodation of remote work for just three hours per day, which Defendants denied, even though Defendants allowed non-pregnant, non-disabled, and non-caretaking employees to work remotely at various times throughout the year, simply because they could not believe that Plaintiff would actually "work" at home because she was pregnant, disabled, and had a high-risk pregnancy.

24.    After denying Plaintiff her reasonable accommodation of remote work, Defendants forced Plaintiff to take her limited paid time off ("PTO") days, ordered her to take a pay cut to 75% of her salary, placed unnecessary and new restrictions on her, and forced her to take five months of unpaid leave, a significant strain on her family. Finally, when Plaintiff asked her supervisor again for pay equity with the other Program Officers and told her that she believed she had been a victim of discrimination, her supervisor responded by denying the equity increase, refusing to acknowledge the discrimination, but admitting that Defendant NYWF *does* engage in pregnancy discrimination,

in that Defendants would *never* give an "important" project to a woman who had announced she was pregnant.

25.     Ultimately, Plaintiff simply could not continue with an organization that was so clearly misaligned between its espoused mission and values and its internal practices and procedures, and which had subjected her to abject pregnancy, disability, and caregiver discrimination, and equal pay violations, and was therefore constructively terminated. Trying to ensure that Defendants did not discriminate against herself and other Black women, working mothers, disabled persons, and pregnant women cost Plaintiff her job, and the career that she loved at Defendants.

## FACTUAL BACKGROUND

### Plaintiff Suffers From a Rare Blood Disorder

26.     Plaintiff suffers from a rare blood disorder and sees a primary care doctor and a hematologist in order to treat the disorder. As part of her treatment, Plaintiff receives iron-infusion therapy, which involves the delivery of iron directly into her bloodstream through a vein in her arm.

27.     When Plaintiff's iron levels are deficient, she receives infusions once a week for five or six weeks.  The infusions are critical and necessary, although they cause sickness and exhaustion in Plaintiff for approximately one or sometimes two days when she receives them. Plaintiff checks her iron levels with her doctors regularly to identify whether her iron levels are stable or deficient.

28.     Throughout her career, Plaintiff has successfully worked in her various positions despite her rare blood disorder, and her doctor's visits and treatment. Often, Plaintiff made a point to schedule her iron-infusion therapy on Friday afternoons, so that the sickness and exhaustion she experienced following the infusions did not interfere with her work.

### Plaintiff Has a Complicated and High-Risk First Pregnancy

29.     From in or about September 2015 to June 2016, Plaintiff was happily pregnant with

her first child, and she was excited to expand her family.

30.    Unfortunately, Plaintiff suffered from the disease *hyperemesis gravidarum*, which causes vomiting and nausea throughout pregnancy. Plaintiff vomited in the morning and in the early evening throughout her pregnancy.

31.    In one instance during her first pregnancy, Plaintiff fainted on the Metro North train because of the *hyperemesis gravidarum*, putting herself and her pregnancy in danger, and her doctor ordered her to be on complete bed rest for the rest of her pregnancy. Thankfully, her employer at that time allowed Plaintiff to work remotely from home during her pregnancy, while on bed rest.

32.    She gave birth to a healthy baby girl in June 2016.

**Plaintiff Experiences Gender and Care-giver Discrimination During
Her Interview Process at Defendant NYWF**

33.    Plaintiff has over a decade of experience in the non-profit sector. She is a grant maker with experience in social justice philanthropy and relationship management, and her expertise is in maternal and child health in communities of color. Plaintiff also had a double master's in Public Health and Social Work, and was a Licensed NYS Social Worker.

34.    On or about January 3, 2017, Plaintiff interviewed with Defendant NYWF for the Program Officer role with "The NYC Fund for Girls and Young Women of Color" at Defendant NYWF's office. At the time, Plaintiff had a six-month-old baby. Plaintiff planned on having childcare for her six-month-old baby while she worked. In her interview, Plaintiff made a point of stating to Defendant NYWF that she had an infant.

35.    Plaintiff also made an explicit point to ask about the "work-life balance" at Defendant NYWF. She stated that a work-life balance was important to her, because she had an infant, and needed to provide childcare to her infant after work hours. She also asked about work flexibility and remote work for pregnant women and working mothers.

36.    During the interview Plaintiff made it clear that she hoped to expand her family,

7

and so she also asked about Defendant NYWF's maternity leave policies. Defendant NYWF told her that it offered 12 weeks of paid maternity leave for employees.

37.     Since she was applying for a job with The New York Women's Foundation, she did not believe that she needed to hide her desire to balance her career and family, her need to get home to her child(ren) to provide childcare, or to avoid the topic of getting pregnant or having more children.

38.     On or about March 22, 2017, Plaintiff was informed that she was not given the Program Officer role with "The NYC Fund for Girls and Young Women of Color." Plaintiff was disappointed she didn't receive the job because she knew that she was extremely qualified.

39.     Upon information and belief, this Program Officer role was given to a woman who had far less experience than Plaintiff, but who was not a mother, did not have children, and did not ask about "work-life balance" so that she could provide childcare, or about Defendant NYWF's maternity leave policies.

40.     Approximately one week later, or about March 29, 2017, Plaintiff was contacted by Defendant NYWF about another Program Officer role with similar job responsibilities to the first one. Upon information and belief, Defendant NYWF contacted Plaintiff for this role because another Program Officer had left the position extremely abruptly, and they needed a person to fill the role very quickly.

41.     Plaintiff had a final interview with Defendant CEO Oliveira on or about August 28, 2017.

42.     Upon information and belief, those who had interviewed Plaintiff for the prior Program Officer position had explicitly told Defendant CEO Oliveira that in her prior interview, Plaintiff had told them that she was a mother who had an infant, she had asked about "work-life balance" because of her childcare responsibilities, and had asked about maternity leave.

8

43.     Also, upon information and belief, Defendant CEO Oliveira knew that Plaintiff may be planning on having more children because of Plaintiff's inquiries during her first interviews concerning maternity leave and work flexibility for pregnant women and working mothers.

44.     In the interview, Defendant CEO Oliveira warned her: "I hope you don't plan on getting pregnant again within the first two years of [working at Defendant NYWF?]" Taken aback, and unsure of how to respond to such an unlawful and pregnancy-discriminatory question, Plaintiff laughed nervously in response but did not say anything because she needed the job to support her family and wanted the job because she believed in the mission statement at Defendant NYWF.

45.     Plaintiff was offered the Program Officer role in or about August 2017, and was offered a starting salary of $73,000.

46.     Plaintiff tried to negotiate her salary by asking for $80,000, but Defendant NYWF refused and said that $76,000 was their final offer.

**A Former Employee Informs Plaintiff She Was a Victim**
**of Pregnancy Discrimination**

47.     In or about August or September 2017, but before Plaintiff accepted Defendants' offer, she made a coffee date with a former Program Officer, who is also a woman of color. She asked her about working at Defendants.

48.     The former employee warned Plaintiff that Defendants would be hostile towards her as a working mother, as a caretaker of a child and a childcare provider, and to her as a pregnant woman if she wanted to have more children. She told her that she knew explicitly that Plaintiff was specifically not selected for the first position Plaintiff applied for – the role of Program Officer for "The NYC Fund for Girls & Young Women of Color" – because Plaintiff had inquired about work-life balance, flexibility for pregnant and working mothers, and maternity leave in her first interview, and thus Defendants told the former employee, they felt she would "not be the right fit," because of her potential parenting and child care responsibilities.  She said that they offered Plaintiff the

9

second Program Officer position despite her parental and child care responsibilities because two other Program Officers had left Defendants, so they were desperate for "warm bodies" and to hire someone as soon as possible.

49.    Plaintiff accepted that working at Defendants might present challenges regarding her childcare and future child-rearing, but believing in the mission statement of Defendant NYWF and wanting to work with their programs, Plaintiff accepted the salary of $76,000 in or about September 2017. She hoped she would get pay raises commensurate with her many years of experience in the future.

### Plaintiff Begins Employment at Defendants

50.    On or about October 10, 2017, Plaintiff began her employment at Defendant NYWF.

51.    She was hired alongside Bianca Alston ("Co-worker Alston"), who was also a Program Officer, also a Black woman but not a mother. Sadie Casamenti, ("Co-worker Casamenti") was the Program Officer who had received the position with the "NYC Fund for Girls and Young Women of Color" that Plaintiff originally applied for and was not hired for; she was, on information and belief, a Latina woman, and not a mother.

52.    Plaintiff's supervisors were Jennifer Agmi, a Director of Programs ("Director Agmi"), and Lorraine Stephens, Vice President of Programs ("VP Stephens") at the time Plaintiff was hired. Plaintiff had a positive relationship with Director Agmi and VP Stephens, who appreciated her work and regularly praised her.

53.    Plaintiff was responsible for relationship management with the organizations that received grants from Defendant NYWF (called "grantee partners"). This included having phone calls and email correspondence with grantee partners in order to provide them support and assistance in implementing their grants from Defendants. Plaintiff had the largest portfolio of the

Program Officers, with up to 29 grantees, because of her prior foundation experience.

54.     The other part of Plaintiff's job was giving Defendant NYWF recommendations on what organizations would receive grants from Defendant NYWF. This included reading proposals submitted in response to the Defendant NYWF's Grant Guidelines, commonly known as Requests for Proposals ("RFPs"). Plaintiff also supervised a team or multiple teams of volunteers who would go on "site visits" to organizations being considered for grants. Plaintiff and her team also made site visits virtually on the phone or computer "zoom" meetings for organizations not based in New York.

55.     Plaintiff's work at Defendants was extremely demanding, and she worked many nights and weekends. She would often work until 5:30 pm, provide childcare to her infant, and then work many more hours in the evening after her infant had gone to bed, and work on weekends in between caring for her child.

56.     When RFPs were submitted by grantees at least twice a year, Plaintiff spent many weeks reading, analyzing, and commenting on RFPs. In those time periods, the workload was large and the time period intense. During this time that the RFPs were submitted, Plaintiff and her colleagues were permitted, and in fact encouraged, to work from home.

**Plaintiff's Attempts to Clarify Defendants' Pregnancy Leave
and Childcare Policies and are Met with Hostility**

57.     In or about the Fall of 2017, her first month at Defendants, Plaintiff received Defendant NYWF's Employee Handbook and was surprised that it stated that Defendant NYWF only gave 12 consecutive weeks of *unpaid* leave for maternity leave, even though she had been told during her interviews that Defendant NYWF provided 12 weeks of *paid* leave.

58.     Plaintiff contacted Defendant NYWF's Director of HR and Administration, Defendant HR Director Miller and asked for clarification on the maternity leave policy, to make sure that Defendant NYWF provided 12 weeks of paid leave.

59.     Plaintiff asked that the Employee Handbook be updated with these policies, stating that she believed that the leave should be in writing to ensure that all employees knew of the policy. Plaintiff knew that it was important to make employees aware of the policy in writing because this may affect their choices to have a family or not.

60.     Defendant HR Director Miller responded with hostility, stating that maternity leave was 12 weeks of paid leave, and that the Employee Handbook was "only updated every January."

61.     Plaintiff was wary that the maternity leave policy was not in writing and that Defendants were refusing to put it in writing, but made a note to bring this up again before January, when a new Employee Handbook allegedly came out.

62.     Upon information and belief, Defendant HR Director Miller informed Defendant CEO Oliveira that Plaintiff had requested that Defendant NYWF's maternity leave to be confirmed in writing in the Employee Handbook.

63.     From that moment on, Defendant HR Director Miller treated Plaintiff with disrespect and hostility each time she interacted with her. She was short in her answers to her, and patronizing and belittling in her emails to her.  Upon information and belief, Defendant HR Director Miller treated Plaintiff with hostility because she had inquired about maternity leave, and requested that the 12 week paid leave policy was put in writing and Defendant HR Director Miller was hostile to working mothers and pregnant women at Defendants.

64.     In January 2018, VP Stephens transitioned from her role into another position with Defendants and was replaced by Defendant VP Emeagwali.

65.     In her new role, Defendant VP Emeagwali was Director Agmi's supervisor, and therefore functionally supervised Plaintiff as well.

66.     On information and belief, Plaintiff's colleague, Kate Landon, was passed over for the Vice President of Programs position vacated by VP Stephens because she was on pregnancy

leave.

## Defendants Avoid Allowing Plaintiff Use Time Off

67.     After VP Emeagwali was promoted and began to supervise Director Agmi, Plaintiff requested to use floating holidays and PTO, which she had accrued, to care for her child.

68.     Upon information and belief, Defendant VP Emeagwali stalled many months in approving Plaintiff's requests for days off for her child's daycare holidays so that she could provide childcare, and questioned why Plaintiff needed those days off.

69.     On information and belied, Defendant VP Emeagwali did not stall when approving employees without childcare responsibilities PTO requests.

70.     When Plaintiff approached HR regarding the failure of Defendants to approve her requested days off, Defendant HR Director Miller angrily told Plaintiff that she was "wrong" about their policy on floating holidays, which Plaintiff also used to take care of her child.

71.     In addition, Plaintiff provided Defendants with the days off she would need for the entire year in advance. Plaintiff made it very clear that she would be asking for this time off because these coincided with her child's daycare school holidays, when she would need to provide childcare for her infant.

72.     Defendant VP Emeagwali received these requests but simply said she "would see" if she could provide these days to her, not immediately providing Plaintiff with the days that she needed to provide childcare as a working mother. Upon information and belief, Defendant HR Director Miller was also hostile to the idea that Plaintiff should need these days off because she was a working mother.

73.     On or about On or about May 23, 2018, Plaintiff asked Defendant VP Emeagwali about the process for PTO requests, including how far in advance they should be requested, how long should it typically take to be approved, and how approvals were decided in front of other

employees.

74.     Defendant VP Emeagwali respondent that Defendants always wanted to make sure that there was at least one staff person from each team in the office. Plaintiff responded that Program Officers typically met in advance to discuss their proposed time off to ensure that this requirement was met, so she didn't understand why Defendants avoided allowing Plaintiff to use time off, while approving the use of time by other colleagues.

**Plaintiff Publicly Advocates for Pregnancy, Child-rearing, and Maternity Policies**

75.     On September 27, 2018, Defendants held a "Strategic Planning" meeting, whose purpose would be to formulate a "Strategic Plan" to establish future policies at Defendant NYWF. This was attended by all staff members at Defendant, including Defendant CEO Oliveira, Defendant VP Emeagwali, Defendant HR Director Miller, and Supervisor Agmi.

76.     At the strategic planning meeting, Defendants asked the staff what policies they believed should be in place for the future. In the meeting, Plaintiff vocally and publicly advocated for longer maternity/parental leave including up to six months (24 weeks) of paid leave, a "back up" childcare option, meaning that if an employee had a sudden childcare emergency, The Foundation would provide childcare options, more flexibility for working mothers, a childcare subsidy, and other policies that support pregnant women and mothers.

77.     Plaintiff spoke passionately about being a working mother and trying to balance her work with Defendants with her childcare and parental responsibilities, and about her need for "work-life balance."

78.     Defendant CEO Oliveira said that she would "consider" the suggestions that staff made, including those made by Plaintiff.

79.     Upon information and belief, Plaintiff's vocal advocacy for pregnancy, maternity and childcare policies and her talk of "work-life balance" angered executive and managerial staff

at Defendant NYWF, who thereafter believed that Plaintiff was a "problem" employee. Also, upon information and belief, Defendant NYWF's managers believed that Plaintiff did not work as hard, would not work as hard, or was not as deserving of equal pay, raises or promotions, simply because she was a working mother, she asked about "work-life balance" because of childcare, and they believed she wanted to be pregnant because she asked about maternity leave.

80.     Ultimately, the final version of the Strategic Plan implemented none of the policies for which Plaintiff advocated concerning these issues.

81.     Meanwhile, in or about October 2018, Director Agmi left Defendants, and Plaintiff thereafter directly reported to Defendant VP Emeagwali during an interim period before they hired a new Director of Programs.

**Plaintiff Receives a Stellar Performance Evaluation**

82.     On or about October 3, 2018, Plaintiff received a performance evaluation from Supervisor Agmi before Supervisor Agmi left Defendants.

83.     In addition to detailing Plaintiff's numerous accomplishments on projects at Defendant NYWF, the evaluation stated that Plaintiff had worked to build strong relationships with partners, she "was always willing to take on new projects whether they were in or out of her original purview," and was able to take on strong "leadership roles."

84.     Plaintiff was pleased that her hard work and dedication to Defendants had been recognized by her supervisor. Throughout her time at Defendants, she had been repeatedly praised by Supervisor Agmi, by her colleagues, her grantee partners, Defendants' volunteers and donors, and the executive directors and employees of the organizations with which she partnered. She was happy that she was truly making a difference in people's lives by working at Defendants.

**Plaintiff's Salary is Lower Than Her Similarly Situated Colleagues
Because of Race Discrimination**

85.     In or about September and October 2018, Defendant hired three more Program

Officers, with similar if not identical job descriptions to Plaintiff – Guisela Morroquin ("Co-worker Marroquin"), a Latina woman, Kelsey Baker ("Co-worker Baker"), who was Black but had fairer skin than Plaintiff, and Dimple D. Patel ("Co-worker Patel"), a South Asian (Indian) woman, and none of whom were mothers or were pregnant. All of these Program Officers, including Plaintiff and Co-worker Alston, had similar if not identical job responsibilities, worked very closely with each other and they all attended meetings together as Program Officers to discuss their work.

86.     In or about Fall 2018, based on conversations with her colleagues, Plaintiff came to suspect that her salary was significantly lower than other Program Officers with the same title and job responsibility as hers, but had less experience, were not Black women or who had fairer skin than Plaintiff, were not mothers, did not have children or caretaking responsibilities and who had not inquired about maternity leave or pushed for work-life balance because of childcare.

87.     Plaintiff set out to find the truth, and asked her colleagues privately what their salaries were.

88.     Plaintiff came to know that her salary was significantly less than the other Program Officers, none of whom were, mothers, caretakers of children, or, upon information and belief, had inquired about maternity leave or work-life balance because of childcare and who all were not Black or had fairer skin tone than Plaintiff. According to her calculations, it was a disparity of at least $10,000, and Plaintiff made a plan to speak to Defendants about this pay inequity.

### Plaintiff Asks Her Supervisor for Equal Pay

89.     In or about November or December 2018, Plaintiff asked for a pay raise to $90,000. She knew that this would make her salary comparable to the other, non-Black (or had fairer skin than Plaintiff) and non-mother Program Officers, and commensurate with her experience and her two Masters' degrees.

90.     Plaintiff did not disclose that she knew that the other Program Officers were making

$10,000 more than she was because the other Program Officers had told her in confidence, and asked her not to reveal that they had told her to their supervisors.

91.     Plaintiff made a long list of her significant accomplishments at Defendants to date, including the fact that she had the largest portfolio of all the Program Officers, she was the primary contact for external requests for funding inquiries, and that she had single-handedly designed and implemented Defendants' "civic engagement strategy" and that she had worked collaboratively with the fundraising/development and communications teams to further the Defendants' work. She stated that this and her advanced degrees merited a salary increase.

92.     Defendant VP Emeagwali told Plaintiff that $90,000 was not in her "salary band" as a Program Officer. She also told Plaintiff that the discussion on a raise should have happened when she had her performance evaluation. When Plaintiff said that neither she nor Director Agmi had brought up a raise in her last performance evaluation, Defendant VP Emeagwali said she was sorry, but she couldn't provide her a raise until her next performance evaluation, in or about October 2019.

93.     Upon information and belief, Plaintiff continued to be paid less than non-Black (or Black employees with fairer skin) and non-mother colleagues, in violation of the Equal Pay Act and the New York Equal Pay Act.

94.     Then, in or about February 2019, Defendant hired Carla Steen to be Director of Programs ("Director Steen"), and she became Plaintiff's supervisor, along with Defendant VP Emeagwali.

95.     Upon information and belief, as soon as she was hired, Director Steen heard from Defendant HR Director Miller, Defendant VP Emeagwali and/or Defendant CEO Oliveira that Plaintiff, her new supervisee, was a "problem employee," who was a mother of a young child, was concerned with work-life balance because of childcare, and advocated for better maternity and

17

childcare policies at Defendant NYWF.

### A Former Employee Tells Plaintiff She Experienced Discrimination at Defendants

96.     In or about February 2019, Plaintiff was at a Board Training Program when she struck up a conversation with a woman who had previously worked at Defendant NYWF. When she asked the woman why she had left, the woman stated that she left Defendant NYWF when she decided to have children, because she "knew [she] couldn't have kids while[she] was working there" because of Defendant NYWF's hostility to pregnant women and working mothers.

97.     Plaintiff was surprised at the woman's frank disclosure, and that even outside of the office, Defendant NYWF's reputation was as a place that was hostile to pregnant women and women with families. Plaintiff was horrified that an organization billing itself as an organization fighting for women would so blatantly discriminate against women who chose to have children.

### Defendants Tell Plaintiff She Makes $10,000 Less Than Her Colleagues Because of Pregnancy and Childcare Discrimination

98.     In or about the Spring of 2019, Co-worker Alston told Plaintiff that following Plaintiff's lead, she had also asked their Program Officer colleagues for their pay because she suspected that she, too, was being paid less than her Black (or fairer skinned) colleagues. She discovered that she was also being paid approximately $10,000 less.

99.     In a meeting on April 29, 2019, Plaintiff and Co-worker Alston spoke to Director Steen about the $10,000 pay disparity, saying "There is a pay disparity among the Program Officers, we're being paid less, and it's been a big problem for a long time."

100.    Director Steen insultingly told her that she was told by Defendant VP Emeagwali and Defendant CEO Oliveira that Plaintiff and Co-worker Alston "should have negotiated better at the beginning of [their] hire," as if this was *their* fault that they were not being paid equally to their colleagues.

101.    Director Steen also told Plaintiff and Co-worker Alston point-blank that they were

"not expected to work as hard as the other Program Officers."

102.    Upon information and belief, this was coded language for Defendants not expecting both Plaintiff and Co-worker Alston to "work as hard" and not believing that they deserved the same pay as the other Program Officers because they were the *only* Program Officers who were darker-skinned Black women, and because Plaintiff was a mother, was providing childcare to a child, and, even worse, one who asked about maternity leave and therefore intended to have more children.

103.    Upon information and belief, Defendants did not believe that Plaintiff "worked as hard" or deserved the same pay because she was a Black woman, a mother, a woman with childcare responsibilities and even worse, a mother who intended to have more children.

104.    Plaintiff was shocked, and she was particularly shocked that Director Steen was essentially admitting that Defendants viewed her differently because she was a Black woman and a mother, and said again that she believed she deserved to be paid the same amount as her colleagues. Director Steen said dismissively that they would consider a raise for her after the next performance review in October 2019.

**Plaintiff Tells Director Steen About Her Rare Blood Disease**

105.    On or about May 8, 2019, Plaintiff was forced, because she was feeling ill, to take a half sickday, and then became ill at an off-site event on or about May 15, 2019.

106.    On or about May 17, 2019, Plaintiff visited her hematologist who told her that her iron levels were "low," and that because of her rare blood disorder, she would have to receive weekly or bi-weekly iron-infusion treatments. She also told Plaintiff that because the treatments were taxing on the body, she would have to receive an IV for rehydration, and would have to rest after the treatments.

107.    That same day, Plaintiff called a meeting with Director Steen to give her a heads

up – she would need to get iron-infusion treatments for her rare blood disorder once a week or bi-weekly. She told Director Steen that the treatments often made her ill and tired, but that whenever she could, she would try to schedule the iron-infusion treatments on Friday late afternoons so they would not interfere with her work. Director Steen looked surprised but said "Okay."

**Plaintiff's Supervisor Says She "Doesn't Work Hard" and is "Lazy"**

108.     On or about May 21, 2019, Plaintiff attended a work meeting with Director Steen, Co-worker Alston, and the Grants Manager Lynn Fitzgerald-Tahsir, to prepare for an upcoming training. During the meeting, Plaintiff and Co-Worker Alston presented an overview of the training that they had created together, and had worked on collaboratively together for the previous three months.

109.     After they both presented the plan for the training, Director Steen, who was White, looked at Co-worker Alston as if Plaintiff was not there and thanked Co-Worker Alston, who was African-American like Plaintiff, profusely for her strong leadership on the project, and praised her as if she had created the plan entirely on her own as opposed to in partnership with Plaintiff.

110.     Co-worker Alston, clearly taken aback, reminded Director Steen that the work was a team effort, and that she and Plaintiff had worked on the project together, with equal input. She laughed lightheartedly and said that she and Plaintiff work very similarly, in that they were both extremely meticulous about their work plans and their work in general.

111.     Shockingly, Director Steen "corrected" Co-worker Alston and told her that she and Plaintiff were, in fact, "very different," because Plaintiff "didn't work as hard [as Co-worker Alston]" and was "lazy."

112.     Plaintiff was shocked and looked at Co-worker Alston, whose mouth had dropped open because their White manager had used the racialized term of "lazy" to describe her, a Black woman and mother.

20

113.     Plaintiff was too upset to speak, and Co-worker Alston again defended Plaintiff saying "You don't know [Plaintiff], she works really hard," to which Director Sheen shrugged and ended the meeting. Plaintiff and Co-worker Alston quietly walked out of the door.

114.     Plaintiff was extremely shocked and upset at Director Steen's insulting and derogatory racialized statement about her, and couldn't believe that despite all the hard work she had done for Defendants and the praise she had received from Supervisor Agmi, she was being labelled as lazy and less hard working than her co-workers.

115.     Upon information and belief, Director Steen believed Plaintiff didn't "work as hard" and was allegedly "lazy" because she was a Black woman and a mother, because she advocated for better maternity and childcare benefits and work-life balance because of childcare, and because she had told Director Steen that she had to miss work in order to get treatment for a disability, her rare blood disorder.

116.     Following this meeting, Plaintiff felt extremely anxious, and immediately wondered if Director Steen was setting her up to be terminated.

**Plaintiff is Told She Will Have a High-Risk Pregnancy**

117.     On or about May 24, 2019, Plaintiff had an appointment with her doctor, who told her that she was pregnant. Plaintiff was very happy, and excited to expand her family.

118.     Plaintiff sought care from a new doctor who told her that because she experienced it in her last pregnancy, it was likely she would again have *hyperemesis gravidarum*, which causes vomiting and nausea throughout the pregnancy, and for which Plaintiff had been put on "bed rest" in her last pregnancy. She told her that this could be exacerbated by her rare blood disorder.

119.     Her doctor gave her instructions on how to stay safe during her pregnancy, and told her to tell her hematologist she was pregnant.

120.     The hematologist said that normally Plaintiff would receive iron-infusion

treatments because her iron levels were low, but that she could not receive iron-infusion treatments during the early first trimester of her pregnancy.

### Plaintiff Begins to Suffer From a Disability - *Hyperemesis Gravidarum*

121.    Unfortunately, in or about late May 2019, Plaintiff began to be ill from *hyperemesis gravidarum*. She had repeated vomiting and was nauseated, but was committed to continue her work.

122.    On or about May 28, 2019, Plaintiff was ill in the morning, and called in for a half sick day. Conscious of the fact that she had been called "lazy" and accused of not "working as hard" by Director Steen in the prior meeting and that she may have to call in sick or take medical appointments, Plaintiff knew that she would have to tell all of her supervisors that she was pregnant, had *hyperemesis gravidarum* and a rare blood disorder.

### Plaintiff Discloses Her Pregnancy to Her Supervisors

123.    Also, on or about May 28, 2019, Plaintiff met with Director Steen and Defendant VP Emeagwali and told them that she was pregnant, and that because she had a rare blood disorder, her doctor told her that she would have a high-risk pregnancy. She also stated that she suffered from *hyperemesis gravidarum,* which caused nausea, repeated vomiting, and tiredness during her pregnancy. She also said that she had the same illness in her last pregnancy, she had fainted on the train, and her doctor put her on bed rest for her pregnancy. Plaintiff said that she hoped she would not be put on bed rest, and that she would be working as hard as ever despite her sickness.

124.    Her supervisors reacted surprisingly to the news, but strangely, Director Steen and Defendant VP Emeagwali told her not to notify Defendant HR Director Miller of her pregnancy, but that they would "take care of things" themselves.

### Plaintiff Experiences Nausea and Vomiting Early in the Morning, and in the Early Evening

125.    In or about May and June 2019, Plaintiff continued experiencing nausea and

repeated vomiting early in the morning, and in the early evening because of her *hyperemesis gravidarum*. When Plaintiff began tracking exactly when her vomiting happened, it was at 8:30 to 10:30 in the morning, and 5:00 to 6:00 in the evening.

126.    When Plaintiff left her home at 8:30 am and took the subway into work, she often felt nauseated and faint on the subway, particularly if it was during morning rush hour, she did not get a seat on the train because it was too crowded, and she was forced to stand up in a crowded train very close to other passengers. She was often afraid that she would vomit or faint on the subway train, particularly because this had happened in her last pregnancy.

127.    Then, when she arrived at work, she felt nauseated for about two hours, but worked through the nausea, and vomited several times in the bathroom. Plaintiff's nausea subsided in the middle of the day, but she vomited again around 5:00-6:00, and she felt nauseated and faint on the crowded subway during evening rush hour yet again.

128.    Oftentimes, Plaintiff worked in Defendants' conference room, because it was much closer to the bathroom for her to run to when she felt she was going to vomit. The automatic air-freshener in the bathroom and other strong smells that lingered in the workplace made her vomit. Her doctor gave her medication to alleviate the nausea, but oftentimes this wasn't enough.

129.    Nevertheless, Plaintiff continued to work tirelessly on her projects at Defendants, stayed on track, and her work schedule was as busy as ever.

### Defendants Remove Plaintiff's Job Responsibility

130.    In or about early June 2019, just approximately one month after Plaintiff had told her supervisors that she had a blood disorder, a high-risk pregnancy, and *hyperemesis gravidarum*, Plaintiff drafted a job description for an intern role for a youth philanthropy training program for Defendant NYWF for that summer, and Plaintiff put herself as the primary contact for the intern.

131.    On or about Monday, June 3, 2019, Plaintiff sent the job description to Director

Steen and Defendant HR Director Miller to review, and called a meeting to discuss the position.

132.    Before the meeting, Director Steen returned the job description with written feedback from Defendant VP Emeagwali. Inexplicably, Director Steen and Defendant VP Emeagwali took Plaintiff's name off the document as the contact.

133.    Plaintiff contacted Director Steen and asked why her name was crossed-out on the document when she had been the one who drafted the role and who should be the primary contact. Director Steen responded that Plaintiff would not be supervising the intern after all and that taking her name off of the document was Defendant VP Emeagwali's decision. Plaintiff said that she didn't think this was fair, because they were not acknowledging all of the hard work she put in in advocating for an intern for the program and Director Steen said that there was "nothing she could do."

134.    When Plaintiff arrived at the meeting they had called to discuss the intern position, Defendant HR Director Miller said furiously and dismissively that Plaintiff was "no longer needed," and she would no longer supervise the youth intern, opened the door, and quickly escorted her out of the room.

135.    Upon information and belief, Director Steen and Defendant VP Emeagwali took away Plaintiff's responsibilities for supervising the youth intern because she had announced she was pregnant, had a rare blood disorder, and had a high-risk pregnancy, even though Plaintiff could absolutely provide supervision to the youth intern during her pregnancy.

136.    Later that day, also on or about Monday, June 3, 2019, Plaintiff informed Director Steen and Defendant VP Emeagwali that she was leaving for a medical appointment for her *hyperemesis gravidarum*.

### Director Steen Forces Plaintiff to Take A PTO Day Even Though She was Working Remotely

137.    On or about Wednesday, June 5, 2019, Plaintiff emailed Director Steen to tell

24

her that she was feeling ill and so she would be working remotely from home.

138.     That day, as she worked from home, when she felt nausea and tiredness, she worked on her laptop in a resting position, had her necessary food and medicines nearby, and was close to a personal bathroom when she needed to vomit. She was also not subject to strong smells in the workplace which made her vomit.

139.     In addition, the day that she worked from home she did not have to commute to work during morning rush-hour on a very crowded subway train, afraid of vomiting or fainting on the train, which may put herself and her pregnancy in danger.

140.     Throughout that day working at home, Plaintiff worked at her job as hard as she ever worked, and worked a full day, including taking a very important conference call in the afternoon.

141.     Following her afternoon call, however, Director Steen reprimanded Plaintiff, stating that she was absolutely not allowed to work remotely and she would have to take a PTO day.

142.     Plaintiff insisted that she had been working all day, and pointed out the numerous tasks she had completed and the conference call she had participated in. She also told her that she could work just as hard remotely as in the office, and did not think it was fair that she should use her PTO days, which were limited in number.

143.     However, Director Steen insisted that Plaintiff could not work remotely but, and as a small "compromise," reluctantly told Plaintiff to take a *half*-PTO day.

144.     Upon information and belief, had a non-pregnant, non-disabled, and/or non-caretaker employee told Director Steen, or another employee at Defendant, that they were working remotely because they were ill, Director Steen would have "believed" that employee was working and not forced her or him to take a half-PTO day, which were limited in number.

145.     Upon information and belief, Director Steen did not believe that Plaintiff had been working when she said that she had, because of her high-risk pregnancy and her disability. Essentially, Defendants could not believe that someone with a pregnancy and a disability such as Plaintiff could *actually* be working when she said she was, and penalized her for this pregnancy and disability.

## Plaintiff Requests a Reasonable Accommodation

146.     On Thursday, June 6, 2019, Plaintiff requested a meeting with Defendant HR Director Miller, who then asked Director Steen to attend. Plaintiff disclosed to Defendant HR Director Miller, whom she had not previously told, that she was pregnant and had a rare blood disorder. She told Defendant HR Director Miller that she was suffering from *hyperemesis gravidarum,* which made her vomit, nauseated, and tired. She also said that in her previously pregnancy, she had fainted on the train because of her *hyperemesis gravidarum,* and her doctor had ordered her to be on bed rest for most of her first pregnancy. She said that her prior job, however, had allowed her successfully to work remotely from home while she was on bed rest.

147.     In a meeting later that same day with Defendant Director Steen, Plaintiff told Director Steen that she had tracked her vomiting and that it always occurred between 8:30 – 10:30 am, and then 5:00 – 6:00 pm.

148.     She also stated that because she had been nauseated at work, she had been working in the conference room so that she would be closer to the bathroom so that she could run there when she needed to vomit.

149.     Plaintiff then asked Defendants for a reasonable accommodation of working remotely on her laptop from home from 8:30 am – 10:30 am, then travel to the office. Then, she asked to leave the office at 4:00 pm, and continue to work remotely at home until 6:00 pm, or even later, since she usually worked later than that.

150.     She said that she needed to work from home during these times so that she could work on her laptop in a more restful position, be close to the bathroom so that she could vomit, have necessary food and medicine on hand, and not be subject to the strong workplace smells that made her vomit. She told them that of course she would absolutely still be working, even if working on her laptop from home.

151.     Plaintiff also stated that if she left home for work two hours later and one hour early, she would not be commuting by standing up in a crowded train during the morning rush hour, which caused her to fear that she would vomit or faint on the train platform or the train, putting herself and her pregnancy in danger.

152.     After she finished Director Steen told Plaintiff sternly that she could *not* work remotely from home.

153.     Plaintiff was extremely confused as to why they told her that she could not work from home. In fact, Defendant allowed non-pregnant and non-disabled employees to work from home if there was inclement weather and emergencies in New York, if the office air conditioning was out of service in the summer, or multiple other reasons. Defendant also allowed employees to work from home whenever Defendant was in the midst of their very busy grant-making cycle, so that employees could concentrate at home through this very difficult period.

154.     Defendant clearly had the capacity to provide remote working conditions to employees, and did so often. In addition, most of Plaintiff's work was reviewing documents, making phone calls, and answering emails, and so there was no reason why she should have been denied this remote work for just a few hours each day, other than that she had a rare blood disorder and high-risk pregnancy. She and other Defendant employees even conducted site visits remotely via telephone or video for organizations that were not based in New York, and thus she could also conduct site visits remotely if necessary, or schedule them in the middle of the day.

155.     Director Steen told Plaintiff snidely that if she wanted to officially ask for a "reasonable accommodation," she would have to get a note from her doctor and they would "consider it."

156.     Upon information and belief, Defendant HR Director Miller and Director Steen had no intention of providing this reasonable accommodation to Plaintiff because they did not believe she would actually be working if she worked remotely and not in the office, simply because she was pregnant, had a disability, and was a mother. Also, upon information and belief, had a non-pregnant and not child-caretaking employee asked to work remotely from home for any reason, Defendant NYWF, Defendant HR Director Miller, and Director Steen would have allow them to do so.

157.     That same day, on or about June 6, 2019, Plaintiff contacted her doctor who provided a note stating:

> [Plaintiff] is a patient under my medical care who is currently pregnant with an EDC [estimated delivery date] of December 30, 2019. She is experiencing nausea with her pregnancy, for which she is on medication.

158.     After Plaintiff forwarded this note to Director Steen, Defendants told her that the doctor's note was not "good enough" and had to specify that she needed a "reasonable accommodation." Also, on or about June 6, 2019, her doctor provided a second note, stating:

> [Plaintiff] is a patient under my medical care who is currently pregnant with an EDC [estimated delivery date] of December 30, 2019. She is experiencing nausea with her pregnancy, for which she is on medication. It is therefore not unreasonable to allow her to work from home.

159.     After providing this note, Plaintiff did not hear back from Director Steen or Defendant HR Director Miller.

### Director Steen Penalizes and Criticizes Plaintiff Because of Her Disability and High-Risk Pregnancy

160.     On Friday, June 7, 2019,  Director Steen asked Plaintiff to a meeting, and stated that

28

she "highly recommended" that Plaintiff "take a week off" and use her PTO because she "wasn't showing up as her best self."

161.     Plaintiff was absolutely shocked. She had been working tirelessly for Defendants all week and all month, and in fact had finished as many tasks as she always finished while working diligently for Defendants.

162.     Upon information and belief, Director Steen was criticizing and penalizing Plaintiff by ordering her to take her very limited PTO days simply because she had disclosed she had a rare blood disorder, a high-risk pregnancy, and *hyperemesis gravidarum*; she had left the office for a necessary medical appointment that Monday, June 3, 2019; she had stated she was ill and worked eight-hours remotely from home on Wednesday, June 5, 2019; and she had asked for a reasonable accommodation for her disability and high-risk pregnancy on Thursday, June 6, 2019.

163.     Director Steen patronizingly reminded Plaintiff that she should take care of her "workplan" and "deadlines," before going out on this PTO that she was ordering Plaintiff to take, even though Plaintiff, who had certainly managed her work efficiently before she had announced that she had a rare blood disorder and a high-risk pregnancy, did not need this reminder.

164.     Plaintiff objected to taking the PTO, told Director Steen that she had been working hard all that week and month, and that she was simply too busy that week to take PTO, and Director Steen reluctantly agreed to not "force" her to take her own PTO.

### Plaintiff's Supervisor Says She is Being Set up for Termination

165.     While waiting for an answer from HR on her formal request for a reasonable accommodation to work remotely on her laptop for just three hours in the day, Plaintiff continued to come into the office. As per usual, she vomited between about 8:30 to 10:30 am in the morning, and 5:00 to 6:00 pm in the early evening, and she worked in the conference room close to the bathroom so that she could run there to vomit. Strong smells in the office made her vomit. She also continued

to worry that she would vomit or faint on the crowded rush-hour train.

166.     On or about June 10, 2019, Plaintiff had a one-on-one meeting with Director Steen.

167.     Given the fact that Director Steen had first stated in May that Plaintiff was "lazy" and she "didn't work as hard," and that in June she did not "believe" Plaintiff had been working from home and had forced Plaintiff to take a half-day of PTO, and then also in June Director Steen had ordered Plaintiff to take a week of PTO because she allegedly was not "showing up as her best self," Plaintiff was extremely worried that Director Steen was setting her up for termination.

168.     In the meeting, Plaintiff expressed her concern that Director Steen's statement that she was "lazy" and didn't "work as hard" meant that Defendants were going to terminate her employment. She stated to Director Steen point blank: "I feel like The Foundation is setting me up for termination. Is this true?" and Director Steen said: "Yes."

169.     Plaintiff asked her "On what grounds?" and Director Steen stated that there had been "performance issues," and that she was not "as present" in the office and not doing as much work as the other Program Officers.

170.     Shocked, anxious, and upset, Plaintiff's body and face shut down, but she said: "I still work hard for the Foundation, but feel like I'm being judged for this one season of my life, when I've been sick and pregnant, but all my hard work when I was not pregnant is being thrown to the wind."

171.     She stated that perhaps Director Steen's belief that she was not "as present" in the office had to do with Plaintiff's recent nausea because of her *hyperemesis gravidarum*, or the doctor's appointments that she went to which were absolutely necessary for her treatment.

172.     Director Steen did not respond to Plaintiff's report that she believed her complaints about her performance were because of her high-risk pregnancy or doctor's appointments, and simply went on to discuss other work issues.

**Plaintiff Requests a Reasonable Accommodation Yet Again**

173.    On June 13, 2019, Plaintiff had a regularly scheduled supervision meeting. Plaintiff told Director Sheen that she was still experiencing nausea and tiredness in the early morning, and in the late afternoon and early evening because of her rare blood disorder, high-risk pregnancy and *hyperemesis gravidarum*.

174.    She asked whether she or Human Resources had made a decision on her request for the reasonable accommodation of remote work from 8:30 to 10:30 am, and 4:00-5:00 pm, for which she had provided a doctor's note.

175.    Director Sheen said, "We'll see."

**Director Steen Calls Plaintiff a "Slacker" Who Is "Not Doing Her Work"**

176.    On or about June 18, 2019, Plaintiff had not heard from Human Resources regarding her accommodation request, so she decided to officially request it again from Director Steen. She was still experiencing the same symptoms, nausea, and tiredness because of her rare blood disorder, high-risk pregnancy and *hyperemesis gravidarum*.

177.    On or about June 18, 2019 in a one-on-one meeting with Director Steen, Plaintiff again raised the issue of her reasonable accommodation with her, asking what the status was of her request.

178.    Director Steen abruptly changed the subject and told Plaintiff that she was "underperforming," that she was "not doing her work," and that she was a "slacker."

179.    Plaintiff protested yet again that she just did not think that she was underperforming, and that she worked harder and longer hours than any of the other Program Officers, and had a larger portfolio than the others because of her experience.

180.    Plaintiff yet again protested and complained that she felt she was being penalized simply because she was ill from her rare blood disorder and a high-risk pregnancy, but that she had

31

continued to do excellent work for Defendants.

181.    Upset at again being unjustifiably attacked for her rare blood disorder, high-risk pregnancy, and *hyperemesis gravidarum* and request for a reasonable accommodation, Plaintiff remained quiet for the rest of the meeting as Director Steen continued on with the agenda.

**Plaintiff is Forced to Again Request a Reasonable Accommodation**

182.    Plaintiff was confused that Director Steen and Human Resources had not informed her as to whether they would grant her reasonable accommodation. Plaintiff continued to experience the same nausea for two hours in the morning, and one hour in the early evening, and continued to vomit at work. She was still fearful that she would vomit or faint on the crowded rush-hour subway train.

183.    So, on the same day, on or about June 18, 2019, she went to Defendant VP Emeagwali and told her that she had requested a reasonable accommodation to work remotely on her laptop for two hour in the morning, and one hour at the end of the day. She explained to Defendant VP Emeagwali precisely why she needed the reasonable accommodation, as she had explained to Director Steen – the nausea in the morning and early evening, the vomiting, and the smells that made her vomit. She told her about her experience with *hyperemesis gravidarum* in her first pregnancy.

184.    Defendant VP Emeagwali looked surprised, and said that she hadn't known that Plaintiff made the request, and that Director Steen must not have submitted it. She said she would let Defendant HR Director Miller know, and she would talk about it with her.

185.    The next day, June 19, 2019, Plaintiff met with Defendant HR Director Miller and again requested the reasonable accommodation of working remotely for one hour in the morning, and two hours at the end of the day, stating again the reasons why she needed the accommodation. Defendant HR Director Miller said they would consider the request and they would "let her know."

**Human Resources Denies Her Request for a Reasonable Accommodation,
and Forces Her to Receive Part-time Pay**

186.     Plaintiff heard nothing regarding her request. On or about June 25, 2019, Plaintiff made an appointment yet again with Defendant HR Director Miller to ask about her reasonable accommodation request to partially work remotely on her laptop.

187.     Defendant HR Director Miller told Plaintiff that she could absolutely not work remotely. Upon information and belief, in addition to her supervisors, this decision to deny Plaintiff her reasonable accommodation was in direct consultation with Defendant CEO Oliveira, who was informed of Plaintiff's pregnancy and disability.

188.     Plaintiff was extremely confused by Defendant's denial of this reasonable accommodation because Defendant allowed other non-pregnant and non-disabled employees to work from home at various times of the year.

189.     Defendant HR Director Miller told Plaintiff that because she had asked for this reasonable accommodation of remote work from 8:30-10:30 am and 4:00 -5:00 pm, she must stay at home and *not* work during those hours, work in the office for five hours in the middle of the day, and she would *only* be paid 75% pay for the reduced hours.

190.     Plaintiff was despondent at the reduced pay, but she knew that she could not continue sitting in the office when she was vomiting and needed to work remotely because of her health, she was exhausted from vomiting in the office bathroom, and she was very seriously worried about her safety on the subway if she fainted.

191.     Because she had no other choice, Plaintiff was forced to accept 75% pay on June 26, 2019.

**Plaintiff's Supervisor "Apologizes" for "Misunderstanding" Regarding
Her Potential Termination**

192.     On or about June 27, 2019, Plaintiff was called into a meeting with Director Steen

for a "check in."

193.     Shockingly, Director Steen apologized that in their prior conversations, she had said that Plaintiff was being set up for termination, and that she had performance issues (referring to Plaintiff's meetings with her on June 10 and June 18, 2019). She stated that she had "misunderstood" conversations among management concerning her work, and that she and management "understood" that she had been "sick" during that time.

194.     Plaintiff warily thanked her, and said that she was glad that this was "cleared up."

195.     Upon information and belief, although Director Steen and Defendants did discriminatorily believe that Plaintiff was "under-performing" simply because she was a working mother, pregnant, and had a disability, she and Defendants realized that this could be construed as illegal discrimination, and so they "changed their tune" towards Plaintiff, while still privately having discriminatory animus towards her.

196.     Meanwhile, also on or about June 27, 2019, Defendant HR Director Miller sent an email confirming Plaintiff's arrangement of 75% pay, but then took the opportunity to order her to "arrive at work on time," gain approval for attending any external events (which had never been required before she requested a reasonable accommodation) and stated: "We expect that you will continue to do your work and meet your deadlines, in addition that you will conduct your work at your desk, and no longer work out of meeting rooms."

197.     Upon information and belief, Defendant HR Director Miller's imposed a new restriction on her attendance to outside external events because she was pregnant and had requested a reasonable accommodation.

198.     Also, upon information and belief, Defendant HR Director Miller irrationally and unreasonably scolded Plaintiff and forbade her from working out of the conference room (which she had done in order to be closer to the bathroom when she needed to vomit) because she refuse to

believe that Plaintiff was suffering from a disability and needed this very simple accommodation.

## Plaintiff's Reduced Hours are Actually Full-Time

199.     Though Plaintiff was allegedly scheduled to work "reduced hours," and was paid at 75% of her salary, because of the tasks that Director Steen ordered her to complete immediately, she worked more than full time but was not paid for it.

200.     She was expressly ordered to work only five hours in the middle of the day for Defendants, and yet Director Steen continued to send her urgent emails and ordered her to do tasks immediately in the early morning, and in the evening, when she was ordered not to work. At one point, because HR Miller insisted that Plaintiff leave the office at 4:00 p.m., Director Steen had Plaintiff complete tasks at home, knowing the Defendants had denied Plaintiff's reasonable accommodation to work from home.

## Plaintiff is Forced Yet *Again* to Provide a Doctor's Note

201.     On or about July 16, 2019, Plaintiff was forced to go to an urgent care facility because she was feeling so sick and lightheaded on the subway.

202.     On or about July 22, 2019, Plaintiff had an appointment with her doctor following her urgent care visit and told her doctor of her continued sickness from *hyperemesis gravidarum*. Her doctor, mindful of her last pregnancy, was concerned about her health, and told Plaintiff that she simply *must* work from home full time to keep herself and her pregnancy safe.

203.     Her doctor provided a note requesting that Plaintiff be given the reasonable accommodation of working remotely from home full time, or short term disability, stating:

To Whom It May Concern:

Beatrice Lors-Rousseau is a patient who is currently pregnant with an estimated due date of 12/30/19. Given her fatigue and nausea and vomiting of [sic] pregnancy, it is not unreasonable to consider short term disability at this time if her employer will not allow her to work from home. Please forward any paperwork associated with short term disability to my office. If you have further questions, please do not hesitate to contact my office.

204.     Plaintiff submitted this note to Defendant HR Director Miller, hoping and praying that Defendants would do the right thing finally, and allow her to work remotely from home.

**Defendants Yet Against Deny Plaintiff's Reasonable Accommodation**

205.     On or about July 25, 2019, Plaintiff received a call from Defendant HR Director Miller and Defendant VP Emeagwali telling her that her accommodations request had been denied, stating that she could not work remotely.

206.     Plaintiff was extremely frustrated because she knew that she could absolutely work from home in her "role," because much of her work consisted of work on a computer and the telephone, which she could certainly do at home. She also knew that she could conduct the meetings and site visits via phone or video conference, as she did when the partner organizations she worked with were not based in New York.

207.      They told her therefore, that if she needed to take care of her medical issues, she would be forced to apply for short-term disability, which would provide only 60% of her current salary, and told her she could use her PTO to supplement the disability payments.

208.     Plaintiff was dismayed at the significantly lower income offered by short-term disability, but given that Defendants refused to accommodate her, she realized that she had no choice.

209.     Plaintiff applied for short term disability, and her disability leave started on or about July 29, 2019. She continued to have nausea and fatigue during the day because of her high-risk pregnancy, rare blood disorder and *hyperemesis gravidarum*, but she knew that had she just been given the opportunity to work from home, she certainly could have continued doing the job that she loved full-time.

**Plaintiff's Short Term Disability is Denied**

210.     On or about September 5, 2019, MetLife informed Plaintiff that she was denied

short-term disability.

211.    Plaintiff immediately contacted Defendant HR Director Miller and told her that her short Term disability was denied. She did not receive a response.

**Defendants Deny Plaintiff's Accommodation Yet Again, And Tells Her to Use Her Maternity Leave Early Instead**

212.    On or about September 9, 2019, Plaintiff contacted Defendant HR Director Miller yet again, and told her that MetLife had denied her short-term disability. She reiterated that the issues with her high-risk pregnancy and rare blood disorder could be easily accommodated with the reasonable accommodations that she requested previously, that she work remotely.

213.    Defendants again refused to provide Plaintiff with her reasonable accommodation, stating that she could *not* work remotely.

214.    Defendant HR Director Miller said that Plaintiff's only options were to take her twelve weeks of paid maternity leave early, but she would receive *no* salary or paid leave after this period expired.

215.    Her other option was to take unpaid leave, without salary.

216.    Plaintiff again was despondent that Defendants simply refused to give her a reasonable accommodation even though she was able to do her job from home. She knew she could not take her paid leave because then she would have *no* leave once her baby was born.

217.    Even though it would be a struggle to support her family if she took an unpaid leave, Plaintiff was forced to take time off without pay because of her disability simply because Defendants refused to allow her to work remotely from home, something that Defendants certainly allowed other employees at various times.

**Plaintiff Has Her Baby**

218.    In or about October 2019, her doctor told her that her pregnancy was far along enough for her to receive her infusion treatments.

219.    Thereafter, from October 3, 2019 to December 6, 2019, Plaintiff had several medical appointments to get treatment for the rare blood disorder. Plaintiff also went to radiology appointments because of her complicated, high risk pregnancy.

220.    Thankfully, Plaintiff gave birth to a healthy baby on December 27, 2019.

221.    On or about December 30, 2019, Plaintiff's paid parental leave began, which consisted of 12 weeks of paid leave.

222.    While Plaintiff was on leave, in or about January 2020, Defendants hired Sasha Graham, another Program Officer ("Co-worker Graham"). Upon information and belief, despite lesser experience, Defendants also paid Co-worker Graham a higher salary than Plaintiff.

**Plaintiff's Advancement is Penalized Because of Her Parental Leave
and Child-care Responsibilities**

223.    In or about late February or early March 2020, Co-worker Alston called her and said that she had an alarming and uncomfortable conversation with Director Steen about Plaintiff.

224.    Co-worker Alston told Plaintiff that Director Steen had approached her to ask her whether she believed it would be "uncomfortable" between her and Plaintiff, given the fact that they had started at the same time, but now Co-worker Alston was on a "faster track" for a promotion and raise, given the fact that Plaintiff went on maternity leave.

225.    Plaintiff had no idea that she was penalized in her track for a promotion and a raise simply because she had gone out on maternity leave, and was shocked.

**Plaintiff Continues Her Leave Because of COVID-19**

226.    On or about March 20, 2020, New York Governor Andrew Cuomo signed an executive order ordering all New York State citizens to shelter-in-place because of the outbreak  of Covid-19 and ordering that all public schools and pre-schools be closed until further notice.

227.    That month, all Defendants' employees were ordered to work remotely, from home and provided with the technology supports to continue their jobs. Defendants 'employees with

children, including Plaintiff, were given a full salary for 20 hours per week of work for two weeks, upon their transition back into the workplace.

**Plaintiff Reports Discrimination and Asks Defendant VP Emeagwali for Pay Equity**

228.     On or about March 26, 2020, Plaintiff and Defendant VP Emeagwali had a meeting to discuss Plaintiff's transition plan to return to work at Defendants. During this conversation, Plaintiff made clear that she wished to discuss some concerns she had before she decided whether she should "move forward" to "stay with [Defendant]."

229.     Plaintiff reminded Defendant VP Emeagwali that before she was forced to go on unpaid leave, she was under the assumption that she would get short-term disability, and when that was denied, she was unpaid for five months. She told Defendant VP Emeagwali that what this meant financially for her and her family was never "addressed."

230.     Then, she told Defendant VP Emeagwali, when she asked Director Steen for equal pay, Director Steen said that would have to wait until October for a raise. Plaintiff told Defendant VP Emeagwali that Director Steen "literally was just like, you know, 'You're lazy. You're not doing any work. You don't deserve equal pay.'"

231.     Plaintiff told her that before she decided to recommit to working at Defendants, she had to "renegotiate," otherwise she would "walk back into the same situation that [she] left," because "now [she has] two kids and [she's] also thinking about, like, what does work-life balance mean?"

232.     Plaintiff then asked Defendant VP Emeagwali whether she would get a pay equity increase before having a performance based raise, and said that there needed to be a conversation about pay equity in order to fix the pay gap that existed. She told Defendant VP Emeagwali that she expected to be paid the same as what the other Program Officers were paid at Defendant.

233.     Plaintiff pointed out that when she complained about unfair compensation prior to

taking leave, she was told that she would need to wait until October 2019 for her performance review, but since Plaintiff had been on leave during October 2019, she had not received a performance review or any raise in compensation, and she stated that she should not have to wait until October 2020 to receive a raise.

234.    Plaintiff also told Defendant VP Emeagwali that she needed to know what the things were that she needed to accomplish in order for her career to grow, and in order for her not to feel like she was "walking on eggshells" every time she came into the office as to whether she "[had] a job."

235.    After Defendant VP Emeagwali patronizingly "instructed" Plaintiff on what a Program Officer's "role" was, Plaintiff continued:

> "I felt like, it changed on me. 'Cause the way you just described what the role was, that's the role I signed up for in 2017. Right. That's the role I had been fulfilling up until my leave. But I feel like, the conversations, I would say from the moment I gave my, you know, I let you all know that I was expecting [a baby] and that I was starting to have health challenges then it became, oh, you're not doing the role, you don't deserve to be a [program officer.] And so, that's where I'm kind of, like, okay, well, has it shifted? I don't know that it shifted. But, you're saying it hasn't shifted."

236.    At this, Defendant VP Emeagwali became defensive, saying that Defendants had "concerns" about her performance before she shared that she was pregnant and had health issues, in particular her performance on the "statewide civic engagement project," which was a major project on her plate.

237.    When Plaintiff responded that she hadn't gotten the "civic engagement project" until after she had announced she was pregnant and had health issues, (in or about May 2019) Defendant VP Emeagwali admitted that Defendants would never give such a large, and important project to someone who had announced they were pregnant and/or had health issues:

> No, no. You had that project. You were in conversations around that project, we would never, the state-wide civic engagement project after you were, and now so, you were pregnant because you, at the moment, you told us you were pregnant, you told us you were pregnant and had health issues at the same time. We would never add a new project to your

plate, um, once you told us that. As a matter of fact, you told us, you were telling us so early because you had, you were experiencing health challenges.

And so, those are, that is a project, that was an important project. Right.

238.    Defendant VP Emeagwali then told Plaintiff that she would come back to her on the "salary issue" and they could have another conversation.

**Defendant VP Emeagwali Refuses to Provide Pay Equity to Plaintiff**

239.    On or about March 31, 2020, Plaintiff had a second conversation with Defendant VP Emeagwali, who told her that Defendants were prepared to offer her a 3% cost of living ("COLA") increase, but said that she would be ineligible for any other raise or a promotion until her performance review in October 2020.  Defendant VP Emeagwali told Plaintiff the COLA would only be retroactive to the beginning of April 2020, and not go back to October 2019, when Plaintiff should have received the raise. She did not initially address Plaintiff's request for equal pay.

240.    Plaintiff pressed Defendant VP Emeagwali to consider an "equity increase," saying that she and the other Program Officers had been transparent about the differences in their salaries, and this was why she had asked for an "equity increase," and *not* a performance increase.

241.    Defendant VP Emeagwali responded that there was not one salary for all Program Officers, but a "bandwidth" or "band" of salaries, and the comparators in Plaintiff's "salary band" were Co-worker Patel and Co-worker Graham.

242.    Upon information and belief, Plaintiff was not in the same salary "band" as other Program Officers who had been given raises and promotions during the time in which Plaintiff was not promoted because she was a caretaker and then was pregnant.

243.    Within that "salary band," Defendant VP Emeagwali explained, Program Officers who came in with greater experience, took on larger roles, excelled at their roles, and/or received merit-based increases, would receive a salary on the higher end of the "band."  Defendant VP Emeagwali went on to state, nonsensically:

"The phrasing 'equal pay' does not really characterize what The Foundation is doing as it relates to pay, nor would I say that it characterizes many places that have a 'band' or 'range' in which they are paying folks a salary."

244.     Confused, Plaintiff asked Defendant VP Emeagwali to tell her where she "fell" on her salary "band" and, noting that this "band" was not written down on paper, she told her it would be helpful if she could get insight into which band that Defendant was working off of, and where she fit in.

245.     Defendant VP Emeagwali acknowledged that Plaintiff was at the "lower" to "midrange" of her "band." Defendant VP Emeagwali stated patronizingly that Plaintiff had been gone for nine months, and had worked only a year and a half at Defendants, as if this was a reason for Defendants to pay her significantly less than Program Officers that had lesser experience, had started after her, and yet were not mothers, caretakers of children, disabled or who were not Black (or had fairer skin).  Defendant VP Emeagwali reiterated then that Defendants could only offer her a 3% COLA increase, and that she would only be eligible for a raise or a promotion at her next performance review, and that Plaintiff should consider that offer, and let her know if she intended to accept that offer, or cease to work at Defendants.

**Plaintiff is Subject to a Hostile Work Environment**

246.     While Plaintiff continued to work long hours for Defendants, she was continuously subjected to a hostile work environment by Defendant HR Director Miller.

247.     Plaintiff received hostile e-mails reprimanding her for alleged mistakes that had never been brought up before. For example, Defendant HR Director Miller angrily reprimanded Plaintiff for linking a professional photo of herself to her email account, something for which other colleagues had never been scolded.

248.     On another occasion, Defendant HR Director Miller scolded Plaintiff for using the short-hand "EOM" for "end of message" in order to notify Defendants of her days off. Plaintiff

asked her Program Officer colleagues, who had absolutely used the same shorthand language "EOM," if they had been scolded and they said absolutely they had not.

249.     On or about June 2, 2020, Plaintiff sent an email to Defendant HR Director Miller, informing her that she would not be at Defendants' staff meeting because she had to conduct a last-minute site visit for a potential grantee partner. Plaintiff did not believe this would be a problem because she knew that her colleagues and other staff members had to miss staff meetings for various reasons all the time, even for non-work related reasons. She told Defendant HR Director Miller that she would consult with her team to find out whether she had missed anything pertinent in the meeting.

250.     Defendant HR Director Miller's email back to Plaintiff was extremely hostile, telling her that the meeting was mandatory, and stated: "moving forward I will expect you to be professional and committed to The Foundation and attend scheduled staff meetings."

251.     Plaintiff had reached her limit. She had spent years advocating for better policies for pregnant women and working mothers at Defendants, and had been met with hostility by Defendants. She had worked long hours and weekends on a job that she loved, and had been repeatedly praised by her grantee partners. For Defendant HR Director Miller to imply that she was not "professional" or "committed to The Foundation" after all of her hard work made it unbearable for her to return to work as a woman, as a mother, and as a caretaker.

## Plaintiff is Constructively Terminated

252.     On or about June 3, 2020, Plaintiff sent the following email, reporting discrimination and a hostile work environment to Defendant:

Dear Ana,

Since October 2017, I have diligently served as a Program Officer at The New York Women's Foundation. It was a privilege to be as an advocate and supporter of the grantee-partners that continue to work towards creating a just and equitable society for women, girls, and TGNC communities in New York City.

43

Despite my best intentions to fulfill my role and responsibilities, while remaining true to self, maintaining my self-dignity, and embodying my commitment to economic justice, the eradication of gender-based violence, and the preservation of health, sexual rights, and reproductive justice, I have experienced the following impediments:
•        Clear misalignment between The Foundation's espoused mission/values and its internal practices and procedures
•        Hostile work environment
•        Lack of strong and clear parental policies
•        Pay discrimination
•        Pregnancy discrimination

I resign from my current position at The New York Women's Foundation. My last day of employment will be Friday, June 19, 2020.

All the best,
Beatrice Lors-Rousseau

253.    The discrimination Plaintiff faced, the unequal pay she received and the retaliation she experienced from Defendants created an intolerable working condition.

254.    Defendants clearly wanted Plaintiff to resign, as they had made clear by underpaying her and threatening her position.

255.    Plaintiff's last day at Defendant was June 19, 2020.

**AS AND FOR THE FIRST CAUSE OF ACTION**
*(Gender, Pregnancy, and Disability Discrimination in Violation of*
*Title VII of the Civil Rights Act of 1964, the Pregnancy Discrimination Act,*
*and the Americans with Disabilities Act)*
(Against Defendant NYWF)

256.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

257.    Defendant has discriminated against Plaintiff in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.,* as amended by the Civil Rights Act of 1991 ("Title VII"), the Pregnancy Discrimination Act, and the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. Plaintiff has suffered disparate treatment as a result of Defendant's wrongful conduct.

258.    Defendant has discriminated against Plaintiff by treating her differently from and

less preferably than similarly-situated non-pregnant and non-disabled employees and by subjecting her to a hostile work environment, discriminatory pay, discriminatory denial of promotions, disparate terms and conditions of employment, and other forms of discrimination on the basis of her sex, status as a pregnant woman, and disability in violation of the law.

259.     Defendant failed to engage in any interactive process to reasonable accommodate Plaintiff's disability.

260.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

261.     By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII, the Pregnancy Discrimination Act, and the Americans with Disabilities Act. Plaintiff shall seek attorney's fees and punitive damages.

### AND AS FOR THE SECOND CAUSE OF ACTION
*(Race, Gender, Pregnancy, Disability, Familial Status, and Caregiving Discrimination in Violation of the New York State Human Rights Law and the New York City Human Rights Law)*
(Against All Defendants)

262.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

263.     Defendant has discriminated against Plaintiff in violation of the New York State Human Rights Law and the New York City Human Rights Law subjecting her to different treatment on the basis of her race, gender, status as a pregnant woman, familial status, and as a caregiver of children. Plaintiff has suffered disparate treatment as a result of Defendant's wrongful conduct.

264.     Defendant has discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated white, and non-pregnant, non-disabled, and non-care-giving employees and by subjecting her to a hostile work environment, discriminatory pay, discriminatory denial of promotions, disparate terms and conditions of employment, and other forms of discrimination on the basis of her race, gender and status as a pregnant woman, disabled person, and

a care-giver in violation of the law.

265.    Defendants failed to engage in any interactive process to accommodate her disability.

266.    As a further direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

267.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

268.    By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law and the New York City Human Rights Law as to Defendants. Plaintiff shall seek attorney's fees and punitive damages.

## AS AND FOR THE THIRD CAUSE OF ACTION
*(Retaliation in Violation of Title VII of the Civil Rights Act of 1964*
*the Pregnancy Discrimination Act, and the Americans with Disabilities Act)*
(Against Defendant NYWF)

269.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

270.    Plaintiff repeatedly reported to Defendant about Defendant's discriminatory treatment of her.

271.    In retaliation, Defendant subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff to the denial of a promotion, a hostile work environment, disparate treatment, and constructive termination of Plaintiff's employment.

272.    As a further direct and proximate result of Defendant's unlawful employment

practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, co-workers and grantee partners, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

273.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

274.     As a result of Defendant's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

275.     By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII, the Pregnancy Discrimination Act, and the Americans with Disabilities Act. Plaintiff shall seek attorney's fees and punitive damages.

### AND AS FOR A FOURTH CAUSE OF ACTION
*(Retaliation in Violation of the New York State Human Rights Law*
*and the New York City Human Rights Law)*
(Against All Defendants)

276.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

277.     Plaintiff repeatedly reported to Defendants about Defendants' discriminatory treatment of her.

278.     In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff to the denial of a promotion, a hostile work environment, disparate treatment, and a constructive termination of Plaintiff's employment.

279.     As a further direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage,

severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, co-workers and grantee partners, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

280.     Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

281.     As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

282.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law and the New York City Human Rights Law. Plaintiff shall seek attorney's fees and punitive damages.

## AND AS FOR A FIFTH CAUSE OF ACTION
*(Unequal Pay in Violation of the Equal Pay Act 29 U.S.C. §§ 206, et seq.)*
(Against Defendant NYWF)

283.   Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth here.

284.   The acts and practices of Defendant constitutes discrimination against Plaintiff in violation of the Equal Pay Act by unlawfully paying male, non-Black employees, and/or female employees who had children, who were pregnant, and/or who had childcare responsibilities and employees with disabilities less than male employees or those who were not of this status.

285.   At all relevant times, Defendant is an "employer" engaged in interstate commerce and/or in the production of goods for commerce.

286.   At all relevant times, Plaintiff was an employee and Defendant is an employer within the meaning of the Fair Labor Standards Act.

287.   At all relevant times, Defendant employed and/or continue to employ employees, including Plaintiff. At all relevant times, Defendant had gross operating revenues in excess of $500,000.00.

288.   Defendant was aware of complaints and requests for investigation made by Plaintiff concerning the unfair pay practices but did not rectify or investigate its unlawful pay practices.

289.   Defendant's violations of the Equal Pay Act were willful and/or reckless, entitling Plaintiff to the three-year statute of limitations and liquidated damages available under the FLSA and the Equal Pay Act.

## AND AS FOR A SIXTH CAUSE OF ACTION
*(Unequal Pay in Violation of Article 6 of the New York State Equal Pay Act*
*Labor Law §§ 190, et seq)*
(Against All Defendants)

290.   Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth here.

291.   At all relevant times, Plaintiff was an employee and Defendant was an employer within the meaning of the New York Labor Law.

292.   The acts and practices of Defendants constitute discrimination against Plaintiff in violation of the New York State Equal Pay Act by unlawfully paying non-Black employees, female employees who had children, who were pregnant, and/or who had childcare responsibilities and employees who were disabled less than male employees or those who were not of this status.

293.   Defendants were aware of complaints and requests for investigation made by Plaintiff concerning the unfair pay practices but did not rectify or investigate its unlawful pay practices.

294.   Plaintiff's violations of the New York State Equal Pay Act were willful, entitling plaintiff to liquidated damages.

**AND AS FOR A SEVENTH CAUSE OF ACTION**
*(Aiding and Abetting Discrimination and Retaliation under the NYSHRL and NYCHRL)*
(Against Individual Defendants)

295.    Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth here.

296.    New York Executive Law Section 296(6) makes it "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."

297.    New York City Administrative Code Section 8-107(6) makes it "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."

298.    Individual Defendants aided and abetted the Race, Gender, Pregnancy, Disability, Familial Status, and Caregiving Discrimination, and retaliation against Plaintiff.

299.    Defendant NYWF has, and throughout Plaintiff's employment had, a continuous practice or policy of discrimination against Black women who were pregnant or had caregiver status and discouraging them from reporting discrimination.

300.    Defendant NYWF fosters, and throughout Plaintiff's employment fostered, an environment which discriminated and retaliated against Black women who were pregnant or had caregiver responsibilities.

301.    Defendant NYWF has, and through Plaintiff's employment had, a continuous practice or policy of failing to properly investigate complaints of discrimination.

302.    The Individual Defendants aided and abetted the discrimination by, among other things, subjecting Plaintiff to said discrimination, allowing said discrimination to occur, failing to investigate said discrimination, and by creating a hostile work environment.

303.    As a direct and proximate result of this unlawful conduct, Plaintiff has suffered and

will continue to suffer irreparable injury, emotional distress, and other compensable damagesunless and until this Court grants relief.


## **PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendant, for all compensatory, emotional, physical, and punitive damages, lost pay, front pay, injunctive relief, and any other relief to which the Plaintiff is entitled. It is specifically requested that this Court grant judgment in favor of Plaintiff as follows:

    (i)    Declaring that by the acts and practices complained of herein, Defendants have violated Title VII, the ADA, New York State Human Rights Law, New York City Human Rights Law, Equal Pay Act, and New York Equal Pay Act;

    (ii)    Directing Defendants to take such affirmative action as is necessary to ensure that the effects of these violations are eliminated and do not continue to affect Plaintiff's employment opportunities;

    (iii)    Directing Defendants to make Plaintiff whole for all earnings she would have received but for Defendants' discriminatory and retaliatory treatment, including but not limited to, lost wages, pension, and other benefits;

    (iv)    Directing Defendants to pay Plaintiff compensatory damages for her mental anguish, emotional distress, and humiliation;

    (v)    Awarding Plaintiff punitive damages as relates to the malicious and willful conduct of Defendant;

    (vi)    Awarding Plaintiff liquidated damages pursuant to eh Equal Pay Act and New York Equal Pay Act;

    (vii)    Awarding Plaintiff pre- and post-judgment interest;

(viii)   Awarding Plaintiff costs and reasonable attorneys' fees; and

(ix)     Granting Plaintiff such other and further relief as this Court deems necessary and proper.


Dated:  New York, New York
        November 5, 2021

                              Respectfully submitted,


                              GODDARD LAW PLLC
                              *Attorney for Plaintiff*


                              By: _____/s/_____
                              Megan S. Goddard, Esq.
                              Siobhan Klassen, Esq.
                              39 Broadway, Suite 1540
                              New York, New York 10006
                              Office: 646-504-8363
                              Fax: 212-473-8705
                              Megan@goddardlawnyc.com
                              Siobhan@goddardlawnyc.com